**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**IN ADMIRALTY**

ALEJANDRO HERMÓGENES FLORES FRANCO,
*ARMADOR PESQUERO, JOSÉ HERNÁN FLORES VILEZ,*
DAMIÁN ALEJANDRO FLORES LÓPEZ,
ALBERTO GEOVANNY FLORES LÓPEZ,
JORDY ALEXANDER FLORES LUCAS,
GUIDO FRANCISCO BRAVO ALCÍVAR,
GUILLER YIMMY TOALA GARCÍA,
JESÚS DAVID CASTRO QUIROZ,
CELSO NICANOR MAGALLÁN FIGUEROA,
JONATHAN JUNIOR VILLACRESES HOLGUÍN,
SIMÓN NARCISO VILLACRESES PINCAY,
ALEXANDER ALVIA VILLACRESES,
MAURICIO DANIEL MERO ANCHUNDIA,
CÉSAR ADRIÁN MERO PARRALES,
LEONEL ALBERTO PILAY BARAHONA,
RAÚL ESNÁIDER MENA FRANCO, and
SAMUEL DAVID CEDEÑO QUIÑONEZ,

Plaintiffs

v.

UNITED STATES OF AMERICA,

Defendant.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. On March 17, 2026, Defendant United States of America (US) authorized and launched an attack, including by armed drones, against a boat named *La Negra Francesca Duarte II* carrying sixteen (16) fishermen in the Pacific Ocean off the coast of Ecuador, causing injuries to a number of those on board, including Plaintiffs Jordy Alexander Flores Lucas and

Leonel Alberto Pilay Barahona who suffered serious burns from the explosions caused by the drones. As a result of this attack, *La Negra Francesca Duarte II* was totally engulfed with flames and destroyed. The US then kidnapped the surviving fishermen and held them against their will for around 24 hours. The Plaintiffs were then shipped by sea to El Salvador where they were held there against their will in deplorable conditions for days. While in US custody and control, these fishermen were treated by the US in cruel and inhumane ways amounting to torture. The foregoing attack, kidnapping and torture took place despite the fact that the government of Ecuador, after a three-hour inspection, had just cleared the ship and its crew of any illicit activity just before the attack took place.

2. The aforesaid attack and kidnapping were part of an unprecedented and manifestly unlawful U.S. military campaign of lethal strikes against small boats in the Caribbean and eastern Pacific Ocean. Since this military campaign began on September 2, 2025, the United States has launched seventy-one (71) armed attacks against boats in international waters, killing at least 235 people and injuring and maiming countless others. According to a White House official, these strikes have been conducted largely by unmanned aerial vehicles launched from U.S. naval vessels in the Caribbean and Pacific.

3. The United States has not conducted these strikes pursuant to any congressional authorization. Instead, the government has acted unilaterally. And Trump administration officials, including President Donald J. Trump and Secretary of Defense Pete Hegseth have publicized videos of the boat strikes, boasting about and celebrating their own role in killing and injuring defenseless people.

4. These premeditated and intentional attacks against defenseless people lack any plausible legal justification, were ordered by individuals at the highest levels of government and obeyed by military officers in the chain of command.

5. In response to the strikes, members of Congress, former U.S. government officials from across the political spectrum, former military leaders and personnel, experts on the laws of war, and dozens of foreign governments, including some of the United States' closest allies, have condemned the U.S. military strikes as illegal. Reports indicate that inside the Department of Defense, many officers have questioned the legality of the strikes, and that some have even sought private counsel out of concern for potential criminal liability.

6. Confronted with widespread denunciations, the government has made threadbare claims that the lethal boat strikes are lawful under the laws of war. It has pointed to a still-secret Office of Legal Counsel ("OLC") memorandum that reportedly determined that the United States is engaged in a non-international armed conflict against scores of unspecified drug cartels in Latin America. Whatever that secret memorandum states, it cannot render the patently illegal strikes lawful.

7. First, under the plain terms of the laws of war, also known as international humanitarian law ("IHL"), there is no actual armed conflict that could justify the use of military force against the boats, nor was there one on March 17, 2026, when the attack at issue in this case took place. As a result, the United States' campaign of bombings against defenseless vessels and individual violates long-standing and well-accepted international law.

8. Second, even if there were a real armed conflict that could trigger the application of IHL, these airstrikes would still be illegal under that established body of law. Indeed, given

that top U.S. officials ordered the direct, intentional, and unjustified violent attacks against civilians, their actions amount to grave breaches of the 1949 Geneva Conventions, and, as such, war crimes punishable under federal and international law.

9. Third, even if there were a real armed conflict that could trigger the application of IHL, the kidnapping and torture of the Plaintiffs by the US would still amount to grave breaches of the 1945 Geneva Conventions, and, as such, war crimes punishable under federal and international law.

## JURISDICTION & VENUE

10. The United States' wanton, willful and outrageous attacks upon, and kidnapping and torture of, Plaintiffs at sea constitute torts under general admiralty and maritime law, see 28 U.S.C. § 1333. This body of law makes the United States liable to Plaintiffs.

11. This Court has jurisdiction over this case pursuant to the admiralty and maritime jurisdiction statute, 28 U.S.C. § 1333, because the conduct complained of constitutes a wrongful act that caused severe injury occurring on the "high seas," which are waters beyond three (3) nautical miles from the shores of the United States, 46 U.S.C. § 30302. The Court also has jurisdiction under 28 U.S.C. § 1333 because the United States' unlawful attacks, kidnappings and torture constitute general admiralty and maritime torts.

12. Because this suit constitutes a "civil action in admiralty" that "could be maintained" against a "private person" in like circumstances, the Suits in Admiralty Act ("SIAA") waives the United States' sovereign immunity for Plaintiffs' claims brought under general admiralty and maritime law. 46 U.S.C. § 30903(a). Under the SIAA, 46 U.S.C. § 30906, venue is proper in this district because, when pursuing an action under the statute, non-resident

aliens can "bring suit in any district on grounds that otherwise they would have no forum in which to sue." *Malajalian v. United States*, 504 F.2d 842, 844 (1st Cir. 1974) (collecting cases).

13. Alternatively, because this suit constitutes a "civil action in personam . . . against the United States" for "damages caused by a public vessel of the United States," the Public Vessels Act ("PVA") waives the United States' sovereign immunity for Plaintiffs' claims brought under general admiralty and maritime law. 46 U.S.C. § 31102(a)(1). An aircraft launched from a naval vessel to carry out the vessel's mission is an "appurtenance" to the vessel. *See*, *Anderson v. United States*, 317 F.3d 1235, 1237–38 (11th Cir. 2003). And injuries caused by an appurtenance to a vessel are deemed to be caused by that vessel under maritime law. *See*, *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535 (1995). Further, "the government of [Ecuador], in similar circumstances, allows nationals of the United States to sue in its courts," satisfying the PVA's reciprocity requirement. 46 U.S.C § 31111. Under the PVA, venue is proper in this district because where the public vessel at issue "is outside the territorial waters of the United States," and "no plaintiff resides or has an office for the transaction of business in the United States, the action may be brought in the district court of the United States for any district." 46 U.S.C. § 31104(b)(2).

14. Finally, this Court is especially competent to address the allegations in this case given its long-standing experience with maritime and admiralty cases arising from events on the navigable rivers and the port of Erie located within this Court's jurisdiction.

**PARTIES**

15. Plaintiffs Alejandro Hermógenes Flores Franco, Armador Pesquero, José Hernán Flores Vilez, Damián Alejandro Flores López, Alberto Geovanny Flores López, Jordy Alexander

Flores Lucas, Guido Francisco Bravo Alcívar, Guiller Yimmy Toala García, Jesús David Castro Quiroz, Celso Nicanor Magallán Figueroa, Jonathan Junior Villacreses Holguín, Simón Narciso Villacreses Pincay, Alexander Alvia Villacreses, Mauricio Daniel Mero Anchundia, César Adrián Mero Parrales, Leonel Alberto Pilay Barahona, Raúl Esnáider Mena Franco, and Samuel David Cedeño Quiñonez (collectively, "Plaintiffs") are all citizens of Ecuador, and all reside in the port city of Manta, Ecuador. All of the Plaintiffs make their living from fishing off the coast of Ecuador in the Pacific Ocean, and all were on board the boat *La Negra FCA, Duarte II* during the attack at issue in this case.

16. Pursuant to the SIAA's and PVA's waivers of sovereign immunity, Defendant United States of America is responsible for all the acts and omissions of its agents, officers, and personnel described herein. Their conduct is attributable to Defendant because United States agents, officers, and personnel, including and under the command and control of President Donald J. Trump and Secretary of Defense Pete Hegseth, acting in their official capacities, authorized and/or carried out the attack on *La Negra FCA, Duarte II* on March 17, 2026.

## FACTUAL ALLEGATIONS

17. On March 3, 2026, United States Southern Command (SouthCom) announced that "Ecuadorian and U.S. military forces launched operations against . . . narco-terrorists who have long inflicted terror, violence, and corruption on citizens throughout the hemisphere."

18. Meanwhile, on March 2, 2026, Plaintiffs headed out from the port town of Manta, Ecuador on *La Negra Fca. Duarte II* with the intention of fishing in the Pacific Ocean. Plaintiffs spend the next two weeks fishing off the shores of the Galápagos Islands. Then, on March 16, 2026, Plaintiffs started to head back to the port of Manta.

19. While traveling back to port, Plaintiffs were intercepted by the Ecuadoran Navy. Plaintiffs ship was boarded by members of the Ecuadoran Navy, and the ship and crew were then inspected for about three (3) hours. The Ecuadoran Navy cleared the ship and crew of any misconduct and then granted them leave to continue sailing to the port of Manta.

20. On March 17, 2026, Plaintiffs' ship was attacked by two separate armed drones while the ship was at sea about 385 nautical miles off Manta and 225-235 nautical miles from San Cristóbal Island in the Galápagos. These drones were launched from a vessel operated by the United States.

21. The bombs launched from the drones set the ship, *La Negra Fca. Duarte II*, ablaze. Two of the Plaintiffs aboard the ship, Jordy Alexander Flores Lucas and Leonel Alberto Pilay Barahona, were themselves set on fire and burned on their legs, arms and back. Jordy's leg was burned to the bone, and he bled profusely. The remaining Plaintiffs were put into an extreme sense of fear and proceeded to run around the ship, trying to fine a way out of the flames. All of the Plaintiffs ended up jumping off the ship and into the sea. They then found their way onto small emergency boats which were being carried by *La Negra Fca. Duarte II.*

22. The Plaintiffs then proceeded to sail the small boats towards a blue ship they saw in the distance. A surveillance drone followed them as they made this journey.

23. When the Plaintiffs approached the blue ship, sailors upon that ship aimed their long rifles at them. All of these sailors spoke English. Some of them wore military camouflage uniforms marked by US flags, while others wore life vests which contained the words "US Coast Guard". Because Plaintiff Jordy Alexander Flores Lucas was badly injured, he was brought down to the hull of the boat to receive medical attention. The remaining Plaintiffs' hands were

zip tied and their heads were covered by a plastic hood. And, they were forced to stand barefoot on the iron deck which was very hot. During their time on the boat, they were only given 500 milliliters of water each and no food whatsoever.

24. While receiving medical attention, Jordy was shown by some of the English-speaking military personnel on the ship told him through a translator that they had been the ones who fired drones upon their fishing boat. They showed him a blackboard in which their fishing vessel was drawn and they showed him, by way of illustration, how they attacked *La Negra Fca. Duarte II* with drones. They laughed about what they had done and about how they had destroyed the fishing vessel – a vessel which provided the livelihood of all of the Plaintiffs.

25. On March 18, 2026, the Plaintiffs were then transferred to a Salvadoran ship which sailed them for seven (7) days to a port of the Republic of El Salvador. While in El Salvador, all of the Plaintiffs, with the exception of Jordy Alexander Flores Lucas and Leonel Alberto Pilay Barahona, were held in a comprehensive care center for foreign migrants. Jordy and Leonel were brought to a hospital to receive medical attention for their wounds. Eventually, all of the Plaintiffs were returned by air on separate planes back to El Salvador by the end of March, 2026.

26. All of the Plaintiffs have lost their livelihood as a consequence of the destruction of *La Negra Fca. Duarte II*, and are in dire economic straits. All of the Plaintiffs also suffer severe psychological trauma from the attack and kidnapping discussed herein. Meanwhile, Plaintiffs Jordy Alexander Flores Lucas and Leonel Alberto Pilay Barahona still suffer severe physical pain, scarring and disability from the wounds they endured from the explosives fired by the drones on March 17, 2026.

27. The United States has publicly defended the boat strikes, including the March 17, 2026 strike at issue herein, as lawful. President Trump, Secretary Hegseth, and other government officials have asserted—sometimes with reference to an OLC legal memo they have continued to keep secret— that these strikes are part of a non-international armed conflict supposedly involving the United States and unspecified "drug cartels." Top administration officials have further claimed that the boats they assert are carrying drugs—as well as the people on board—are thus legitimate military targets in this so-called armed conflict. According to news reports, the secret OLC memo concludes that by allegedly trafficking drugs, the boats and civilians in them may be lawfully targeted, regardless of whether they pose any actual military threat to the United States, or whether there are means short of lethal force that could reasonably be employed to neutralize any threat they supposedly pose. The memo is the subject of Freedom of Information Act litigation in the Southern District of New York. See Compl., *ACLU v. DOJ*, No. 25 Civ. 10189 (S.D.N.Y. Dec. 9, 2025).

28. The government has not publicly identified all of the drug cartels with which it claims to be at war, and with respect to nearly all its boat strikes, including the one on March 17, it has not identified any cartel it was purportedly targeting. Nor has the government made public any evidence whatsoever to support its assertions that the boats it has blown up and the people it has killed were members of, or even affiliated with, drug cartels. Nor has the government provided any public evidence that targeted boats were, in fact, carrying drugs or that the occupants were trafficking them, let alone that any such drugs were destined for the United States. Indeed, in a June 2, 2026, hearing before the Senate Foreign Relations Committee, Senator Kaine revealed that "the presence of narcotics on a boat is not one of the targeting

criteria" for the ongoing boat strikes. Senator Paul agreed and added that the presence of arms on a boat is likewise not a targeting criterion.

29. None of the Plaintiffs were members of, or affiliated with, drug cartels or any other designated terrorist group, and this has been confirmed by the Ecuadoran government after a three-hour inspection of the boat and crew.

30. Meanwhile, the US government's own admissions demonstrate that its claims about drug trafficking are dubious, if not fabricated. Thus, the U.S. Coast Guard has acknowledged that, in many cases, boats the government interdicts and searches under suspicion of drug trafficking are ultimately found to have "no illicit contraband aboard." In fact, the White House Chief of Staff admitted in an interview published on December 16, 2025, that the United States' goal in targeting boats had nothing to do with drugs at all, but that the President planned to "keep blowing boats up" until President Nicolás Maduro, of Venezuela, resigned. Since that statement, on January 3, 2026, the United States undertook a military operation in Venezuela, abducted President Maduro and his wife, and reportedly killed scores of people. Since that raid, the government has engaged in 35 to 36 more boat strikes, killing over 114, and possible 123, people.

**Under Any Available Legal Framework, the Boat Strikes Are Illegal**

31. Regardless of any secret evidence the government claims to have to support its unprecedented legal theory, as a matter of plain fact and settled law, there is no bona fide "armed conflict" between the United States and any purported drug cartels (nor was there one when the United States attacked Plaintiffs) which could justify the use of military force.

32. Under IHL, there are two types of "armed conflicts": "international armed conflicts," and "non-international armed conflicts."

33. An "international armed conflict" or "IAC," as defined under Common Article 2 of the 1949 Geneva Conventions and customary international law, exists only when there are armed hostilities between two or more States. *See*, *e.g.*, Dep't of Def., Law of War Manual § 3.3.1 (2015, updated 2023) (confirming U.S. adherence to this IHL definition). The government has not claimed that it is involved in an international armed conflict that justifies its recent campaign of boat strikes, nor has it claimed that the boats it has targeted are military vessels controlled by another State.

34. A "non-international armed conflict" or "NIAC," as defined under Common Article 3 of the 1949 Geneva Conventions and customary international law, exists between a State and a non-State entity only where there is "protracted armed violence," which is military in character, between a State and an "organized armed group." *See also*, *e.g.*, Law of War Manual § 3.3.1. The government has claimed that the United States is engaged in such a "non-international armed conflict" with drug cartels. But it is not, because the established conditions for such a conflict are not remotely met. Almost every laws-of-war expert agrees. See, e.g., Michael Schmitt, Tess Bridgeman & Ryan Goodman, "Operation Southern Spear: Why the Crews, Drugs, and Boats Are Not Targetable," *Just Security* (Dec. 7, 2025), https://www.justsecurity.org/126553/operation southern-spear-international-law.

35. With respect to the relevant criteria, first, there is no actual "protracted armed violence" of the kind cognizable under IHL occurring between the United States and any drug cartel. No drug cartel has confronted the United States using military means, such as tanks and other military equipment, in sustained armed clashes. And drug cartels do not engage in "armed

violence" merely by trafficking drugs. Organized crime—even when it involves violent acts—does not constitute "armed violence" against a State. Organized crime is just that—a crime that, in the United States, is cognizable and punishable by criminal law alone, subject to constitutional constraints including due process of law. See, e.g., 46 U.S.C. § 705 et seq. (regulating criminal maritime drug law enforcement).

36. Second, the United States is not engaged in hostilities against any drug cartel that constitutes an "organized armed group" under IHL. A non-State entity is an "organized armed group" only when it can operate akin to regular armed forces—that is, with a command structure that imposes discipline and utilizes military tactics in a unified manner. No drug cartel that exhibits these indicia of organization is engaged in military-style protracted armed violence against the United States.

37. Because these boat strikes did not occur in an armed conflict, the laws of war do not apply. Instead, the rules under international human rights law and federal law regulate the government's strikes. And those rules protect the right to life and prohibit extrajudicial killing. Thus, under the correct legal framework, the government is barred from using lethal force unless, at the time it is applied, lethal force is a necessary last resort to protect against a concrete, specific, and imminent threat of death or serious physical injury. Not even the government has claimed that its strikes could meet this standard. As a result, the strikes are illegal.

38. Moreover, even if the strikes had somehow been undertaken within an actual armed conflict, they would still be illegal. In an armed conflict, the laws of war constrain the indiscriminate and direct use of force against civilians. Thus, under IHL, if a person is not a member of an opposing State's armed forces or a member of a non-State organized armed group

who is directly participating in hostilities, a State is prohibited from using lethal force against them.

39. Similarly, within an armed conflict, a State may target an object—such as a boat—only (i) where doing so makes an effective contribution to military action, (ii) where the object's destruction, capture or neutralization, in the circumstances ruling at the time, offers a definite military advantage, and (iii) where a strike's military advantage will be proportional to or excessive of its effects, including collateral damage to human life.

40. Thus, even assuming there was an actual armed conflict (which there was not), no conditions existed to justify the government's lethal strikes against civilians or civilian vessels, including the strikes that destroyed *La Negra Fca. Duarte II*, placed all of the Plaintiffs in grave danger and caused grave injury to Plaintiffs. As a result, even in the context of an armed conflict, the strikes against Plaintiffs would constitute a grave breach of the 1949 Geneva Conventions, and thus a war crime, making its perpetrators punishable under federal and international law.

41. Put another way, the United States' drone strikes against civilians and civilian boats in the Caribbean and East Pacific are wrongful and violate international law regardless of which international legal regime applies. First, because there is, in fact, no non-international armed conflict with the drug cartels purportedly targeted in the strikes (and no evidence that the boats targeted are associated with cartels), the strikes, sometimes fatal and always potentially lethal, violate the bedrock prohibitions against extra-judicial killings. And second, even if there were a non-international armed conflict between the United States and drug cartels (and even if there were evidence that the boats targeted were associated with the cartels), the strikes would constitute war crimes under the laws of war and federal law.

42. In particular, the United States' drone strikes against Plaintiffs and their ship were unlawful. Upon information and belief, the United States' agents, officers, and personnel authorized and directed the strike against Plaintiffs even though, at the time the strike was carried out, none of the Plaintiffs were engaged in activities that presented a concrete, specific, and imminent threat of death or serious physical injury to the United States or anyone at all, and means other than lethal force could have reasonably been employed to neutralize any lesser threat they or the boat they were on might have posed.

43 Moreover, the strikes against Plaintiffs and their fishing vessel were unlawful even if carried out in the context of an armed conflict because, upon information and belief, the United States' agents, officers, and personnel authorized and directed the strike even though Plaintiffs were not directly participating in hostilities against the United States at the time of the strike, nor were they members of an organized armed group engaged in an armed conflict with the United States, nor was the boat they were aboard a lawful military target.

**CLAIM FOR RELIEF**

**Count I**

**Intentional Infliction of Emotional Distress**

44. Defendant United States' violent drone attack upon Plaintiffs and their vessel while they were vulnerable on the high seas and presented no threat to the United States or US personnel was extreme and outrageous, going beyond all possible bounds of decency and must be regarded as utterly intolerable in a civilized world.

45. This attack by the United States was carried out with reckless disregard of the high degree of probability that emotional distress would follow.

46. This outrageous conduct of the United States caused Plaintiffs emotional distress so severe and acute that no reasonable person should have to endure it.

47. Defendant United States is therefor liable to Plaintiffs for the tort of intentional infliction of emotional distress and this Court has jurisdiction over this tort, carried out on the high seas, pursuant to the admiralty and maritime jurisdiction statute, 28 U.S.C. § 1333.

**Count II**

**Assault & Battery**

48. Defendant United States intentionally launched armed drones at Plaintiffs and their vessel with the intent that the ordinance fired by the drones make harmful physical contact with Plaintiffs, and ordinance from at least one of the drones did in fact strike Plaintiff Jordy Alexander Flores Lucas and caused severe physical injury to him. Plaintiff Leonel Alberto Pilay Barahona was severely burned by the fire created by the ordinance fired by the drones.

49. The remainder of the Plaintiffs were placed into a state of grave apprehension and terror as a result of the Defendant United States' intentional act of launching these drones against them and the vessel, and by the inferno on the ship created by these drones. This state of apprehension and terror caused Plaintiffs to jump off the boat and into the sea.

50. Defendant United States, through its armed personnel on their vessel, aimed their long rifles at Plaintiffs when they approached this vessel to escape from their boat which was set ablaze by the armed drones. By aiming their rifles at Plaintiffs, these US personnel placed Plaintiffs in a state of grave fear and terror that they would be fired upon. This fear and terror was reasonable especially given the fact that Plaintiffs had just been attacked by armed drones.

51. Through the above illegal acts, Defendant United States are liable to Plaintiffs for the torts of Assault & Battery, and this Court has jurisdiction over these torts, carried out on the high seas, pursuant to the admiralty and maritime jurisdiction statute, 28 U.S.C. § 1333.

**Count III**

**False Imprisonment**

52. *Defendant United States, through armed personnel on their ship, intentionally,* and without legal cause or warrant, restrained and confined all Plaintiffs, with the exception of Plaintiff Jordy Alexander Flores Lucas, through the use of zip ties around their wrists and hoods on their heads and under the threat of armed force. Plaintiffs did not consent to being so restrained or confined. Plaintiffs were so confined against their will for around one full day. Plaintiffs were then taken to El Salvador against their will and held their without their consent until the end of March, 2026.

53. Through the above illegal acts, Defendant United States is liable to Plaintiffs for the tort of false imprisonment, and this Court has jurisdiction over this tort, carried out on the high seas, pursuant to the admiralty and maritime jurisdiction statute, 28 U.S.C. § 1333.

**Count IV**

**Tort of Conversion**

54. The fishing vessel *La Negra Fca. Duarte II* was the legal property of Plaintiff Alejandro Hermógenes Flores Franco, and all of Plaintiffs depended upon this vessel for their livelihood.

55. Defendant United States intentionally launched armed drones at Plaintiffs at *La Negra Fca. Duarte II* with the intent that the ordinance fired by the drones would destroy this vessel. The ordinance did in fact cause a fire which ultimately sank and destroyed the vessel permanently denying Plaintiff Alejandro Hermógenes Flores Franco of this property and denying the remaining Plaintiffs of the use of this property for their livelihood.

56. Through the above illegal acts, Defendant United States is liable to Plaintiffs for the tort of conversion, and this Court has jurisdiction over this tort, carried out on the high seas, pursuant to the admiralty and maritime jurisdiction statute, 28 U.S.C. § 1333.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment awarding them:

A. Pecuniary damages, including compensatory and pecuniary damages, in an amount to be determined at trial;

B. Injunctive relief ordering the United States of America to end such boat attacks in the Caribbean and Pacific; and

C. Such other relief as the Court deems just and proper.

Respectfully submitted this 16th day of November, 2026,

Daniel M. Kovalik, PA# 66065
112 Washington Place, #15K
Pittsburgh, Pa. 15219
(412) 335-6442